# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### July 26, 2012 Session

## AMY RUDD HALLIDAY v. TODD ERIC HALLIDAY

**Appeal from the Circuit Court for Montgomery County**
**No. MCCCCVDV09832     John H. Gasaway, III, Judge**

---

**No. M2011-01892-COA-R3-CV - Filed December 6, 2012**

---

This is a divorce appeal. Husband appeals the court's award of alimony *in solido*, alimony *in futuro*, upward deviations in the calculation of child support to provide for education trust funds and private school expenses for the parties' two children, and the award of discretionary costs; Wife appeals the court's award of attorney's fees. We affirm the award of alimony *in solido*, alimony *in futuro*, and attorneys' fees and remand the case for additional findings with respect to the upward deviations for educational expenses and discretionary costs.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed and Vacated in Part; Case Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, P. J., M. S., and ANDY D. BENNETT, J., joined.

Donald N. Capparella, Nashville, Tennessee, and Larry B. Watson, Clarksville, Tennessee, for the Appellant, Todd Eric Halliday.

Helen Sfikas Rogers and Lawrence James Kamm, Nashville, Tennessee, for the Appellee, Amy Rudd Halliday.

## OPINION

### I. Facts and Procedural Background

This appeal arises from the divorce of Amy Rudd Halliday ("Wife") and Todd Eric Halliday ("Husband") who were married on June 20, 1992; two children were born of the marriage.

Wife filed a complaint for divorce on May 4, 2009, alleging irreconcilable differences; she amended her complaint to allege inappropriate marital conduct and cruel and inhuman treatment. Husband answered on August 28, denying the allegations; on January 8, 2010, he filed a countercomplaint and on January 22 filed a proposed permanent parenting plan. Wife duly answered the countercomplaint and filed a proposed permanent parenting plan.

Trial was held on December 13–15, 17, and 19, 2010. The court entered a decree of divorce on January 31, 2011, which awarded Wife an absolute divorce on the ground of inappropriate marital conduct and adopted Wife's parenting plan with minor adjustments. In setting the amount of child support, the court found Husband's monthly income to be $50,000 and Wife's monthly income to be zero; the court ordered an upward deviation from the child support guidelines and required Husband to fund a post-secondary educational trust for the children and to pay the costs of private school. The court entered a supplemental decree on May 16, classifying the marital property and awarding Wife twenty-eight percent of the marital estate, $1.1 million in alimony *in solido*, $2,500 monthly in alimony *in futuro*, $60,000 in attorney and expert witness fees, and discretionary costs.

Wife filed a Tenn. R. Civ. P. 59 Motion to Alter or Amend requesting, in part, that the court protect the awards of alimony *in solido* and *in futuro* by requiring Husband to procure a life insurance policy listing Wife as the beneficiary. Husband also filed a Tenn. R. Civ. P. 59 motion, requesting that the court consider his recently filed 2010 tax return as the "new best evidence" of his income for purposes of calculating property division, alimony, and child support; that the court eliminate the upward deviation from the Presumptive Child Support Order requiring him to fund an educational trust; and that the court remove the requirement that he pay the children's private school expenses.

After a hearing on July 8, 2011, the court entered an order denying both motions in most respects. The court, however, ordered Husband to obtain additional life insurance to secure the alimony *in futuro* award and to pay certain discretionary costs; the court also amended the parenting plan to correct a clerical error. The court requested an additional memorandum of law with respect to the appropriate amount of expert witness fees to be awarded in the case, and on August 18, the court awarded Wife discretionary costs for expert witnesses.

Husband filed a timely appeal in which he raises the following issues:

1.      Whether the trial court's finding that Mr. Halliday's annual income was $50,000 per month is supported by a preponderance of the evidence when his 2010 tax return shows his true income in 2010 was only $85,000 per year, not $50,000 per month?

2. Whether the trial court erred in determining that Ms. Halliday's income was zero when the trial court also found that she receives $48,000 per year in rental income and the trial court found she could earn another $48,000 per year as a teacher?

3. Whether the trial court's award of alimony in futuro was an abuse of discretion when (1) the parties' income was essentially the same, (2) Ms. Halliday's income when properly considered equaled her claimed need, (3) her receipt of over $1.8 Million in marital property made alimony of any kind unnecessary, and (4) under the holding in *Gonsewski*, alimony in futuro was not justified?

4. Whether the trial court's valuation of Mr. Halliday's business interests relied upon flawed methodology, making the $1.1 Million in alimony in solido unsupported by a preponderance of the evidence?

5. Whether the expert witness fee for Norman Hall for producing a report outside of trial is recoverable as discretionary costs?

Wife also raises the following issues on appeal:

1. The trial court erred when it did not hold a separate hearing on the issue of attorney fees and, instead, awarded attorney fees when the final fee award to be requested was unknown;

2. The trial court erred in barring wife's business valuation expert from attending husband's discovery deposition;[1]

3. This Court of Appeals should remand the issue of the trial court's awards of upward deviations in child support: a) For private school, and (b) to be placed in an educational trust for each child, with instructions to the trial court to make the requisite findings for such awards.

---

[1] Wife contends that the trial court erred by barring wife's business valuation expert from attending husband's deposition; because this court cannot provide any practical relief in this regard, we decline to address this issue.

## II. Discussion

In order to efficiently address each of the issues raised by the parties, our opinion proceeds as follows: award of alimony *in solido*, determination of income, alimony *in futuro*, child support, and fees and costs.

### A. The Trial Court's Award of Alimony *in Solido*

The marital property consisted of personal property, retirement accounts, bank stocks and cash, six parcels of real property, and six business interests owned in whole or in part by Husband. The first issue we consider is whether the court's award of alimony *in solido* is supported by the court's valuation of the six businesses, all of which were entities which owned real estate. Husband contends that the trial court erred by not applying larger discounts for lack of control and lack of marketability to the value of the business interests and that, as a consequence, the interests were overvalued by the court; the overvaluation, he argues, makes the award of alimony *in solido* unsupported by the evidence.

As noted in *Inzer v. Inzer*:

> The value of marital property is a question of fact. As a fact finder, the trial court is free to place a value on a marital asset that is within the range of the evidence presented. A trial court's valuation and distribution of a marital asset will therefore be given great weight on appeal and will not be overturned unless the evidence preponderates against those findings or they are inconsistent with the factors outlined in Tenn. Code Ann. § 36-4-121(c).

*Inzer v. Inzer,* No. M2008-00222-COA-R3-CV, 2009 WL 2263818, at *4 (Tenn. Ct. App. July 28, 2009) (citations omitted). We review the findings of fact by the trial court *de novo* with a presumption that the findings of fact are correct unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Forrest Const. Co., LLC v. Laughlin*, 337 S.W.3d 211, 220 (Tenn. Ct. App. 2009).

The evidence of value of the businesses consisted in large part of the testimony of three expert witnesses: Robert E. Yates, II, a certified public accountant with the Thurman Campbell Group, PLC; David C. Wood, a certified public accountant with Lattimore Black Morgan & Cain, PC; and Kurt A. Myers, a certified public accountant with Myers Valuation Associates, PLLC.[2] Mr. Yates and Mr. Wood each valued the businesses using the net asset

---

[2] Both parties engaged property appraisers to opine as to the value of the real properties held by

(continued...)

method.[3] Each testified and submitted reports reflecting their valuation of the businesses and Husband's interest in each, including the appropriateness and percentage of discounts for lack of control and lack of marketability to Husband's interest in each business. Mr. Myers testified relative to the "applicability and range of the potential discounts associated with the valuations" of two of the companies.

In his report, Mr. Yates opined that a discount for lack of control recognizes that "a controlling owner enjoys many benefits that are not enjoyed by minority . . . owners" and that, as a consequence, "minority interests are therefore usually worth less . . . than a proportionate share of the value of the total entity." Mr. Yates testified that a discount for lack of control is "applied to minority interests . . . where there is a partnership" and the "partner does not enjoy the full rights of ownership." Similarly Mr. Wood noted in his report that "a discount for lack of control measures the decremental effect on an equity investment's pro rata value due to the fact that its owner is unable to exert complete control over the entity's financial operation and legal decisions." Mr. Wood testified that a discount for lack of control is related to "both the size of the interest" and whether there are "multiple types of ownership."

Mr. Yates opined that a discount for lack of marketability "deals with . . . how quickly and easily [an ownership interest] can be converted to cash if the owner chooses to sell." He reviewed cases relating to the discount, various factors with respect to Husband's interests in the businesses, and a study prepared by the Williamette Management Associates; he concluded that a discount for lack of marketability was appropriate for five of the six entities.

Mr. Wood discussed the discount for lack of marketability as recognized in "the current case law applicable to business and investment entities within marital estates along with valuation theory outside of marital case law"; he opined that no discount for lack of marketability was applicable in this case because "the discount is inappropriate if the business is not to be for sale."[4]

_____

[2](...continued)
Husband's businesses. No issue is raised in this appeal regarding the values of the real estate held by the various businesses.

[3] The Supreme Court of Tennessee recognizes three acceptable methods to determine the value of a corporation or business interest: (1) the market value method, (2) the asset value method, and (3) the earnings value or capitalization of earnings method. *Blasingame v. Am. Materials, Inc.,* 654 S.W.2d 659, 666 (Tenn. 1983).

[4] Wood opined further, however, that "it would not be unreasonable to consider a discount for lack of marketability . . . of a small percentage of 5%" to Husband's interests in the Tupeno Partnership and the
(continued...)

The Halliday Company, Inc.

Mr. Yates valued The Halliday Company, Inc., a sub-chapter S corporation in which Husband held a 100% interest, at $431,110, to which he applied a 36.1% discount for lack of marketability, resulting in a net value of $275,479.[5] Mr. Wood testified, consistent with his report, that the value was $679,051 with no discount for lack of marketability. Both experts testified that a lack of control discount was not appropriate because Husband owned a 100% interest.

The court valued the business at $560,000; the court did not apply a discount for either lack of control or marketability.

Mainstreet Investments

Husband owned a 50% interest in Mainstreet Investments, a general partnership. Mr. Yates valued Husband's interest at $879,121; he valued the partnership at $4,233,159, and applied a 35% lack of control discount and a 36.1% lack of marketability discount to Husbands' 50% interest. Mr. Wood valued Husband's interest at $1,929,333, based on a total value of the company of $4,215,278, to which he applied an 8.46% discount for lack of control; he did not testify that a discount for lack of marketability was appropriate. Mr. Myers did not place a value on the business but testified that a discount for lack of control "should be in the range of somewhere between seven and nine percent" and that a discount for lack of marketability would be inappropriate.

The court valued Husband's interest at $1,791,495 and applied a discount of 15% for lack of control; the court did not apply a discount for lack of marketability.

ACI Investment Group, LLC

ACI Investment Group, LLC, is a limited liability corporation in which Husband holds a 50% interest. Mr. Yates valued Husband's interest at $641,966; Mr. Yates valued the company at $3,091,206, and applied a 35% discount for lack of control and a 36.1% discount for lack of marketability to Husband's interest. Mr. Wood valued Husband's 50% interest at $1,418,199, based on a company value of $3,109,906 and an 8.46% discount for lack of

---

[4](...continued)
Tennessee Real Estate Group, LLC.

[5] Mr. Yates originally set the value at $263,977, but amended his report and testimony to reach $275,479.

control; he testified that a discount for lack of marketability would not be proper. Again, Mr. Myers did not place a value on the business but opined that a discount for lack of control "between seven and nine percent" was appropriate and that a discount for lack of marketability was not.

The court valued Husband's interest at $1,316,878, applying a 15% discount for lack of control and no discount for lack of marketability.

## Tupeno Partnership

Husband owned a 17.5% interest in this partnership. Mr. Yates valued Husband's interest at $27,907, based on a company value of $400,582, with a 37.7% discount for lack of control and a 36.1% discount for lack of marketability applied to Husband's interest. Mr. Wood valued Husband's interest at $61,551, applying a 12.2% discount for lack of control.

The court valued Husband's interest at $50,474, based on a finding that the asset of the partnership—an undeveloped 16 acre tract of land adjoining a highway connector—had a value of $400,000. The court found that Husband's interest without discounts was $70,102, to which the court applied a 20% discount for lack of control and a 10% discount for lack of marketability in reaching the final value.

## Tennessee Real Estate Group, LLC

Husband owned a 33.33% interest in Tennessee Real Estate Group, LLC, a limited liability corporation. Mr. Yates testified that Husband's interest was $75,014, based on a company value of $565,349, with a 37.7% discount for lack of control and a 36.1% discount for lack of marketability.[6] Mr. Wood valued Husband's interest at $182,938, based on a company value of $620,051, to which he applied a 11.48% discount for lack of control.

The court valued Husband's interest at $144,151, applying a 15% discount for lack of control and a 10% discount for lack of marketability.

---

[6] One of Mr. Yates' reports placed the value at $37,507; it appears that he erroneously applied an unspecified 50% discount to Husband's interest prior to applying the lack of control and lack of marketability discounts. His other report is consistent with his testimony.

<u>Soaps Laundry</u>

Soaps Laundry is a general partnership in which Husband holds a one-half interest. Mr. Yates valued Husband's interest at negative $83,114, with no discounts. Mr. Wood valued Husband's interest at $52,069, with no discounts.

The court determined that the business had a negative value and that Husband's "negative value is $83,114."

In valuing Husband's interest in each business, the trial court applied a discount for lack of control where Husband did not enjoy a 100% interest in the business and the discount applied was within the range of the experts' testimony. Where the court found a discount for lack of marketability appropriate, the discount fell within the range and was consistent with the expert testimony. The evidence does not preponderate against the specific amount of discounts applied by the court, the valuations of the business entities or Husbands interests therein. The valuations are affirmed.

There being no further issues regarding the award of alimony *in solido*, the award is affirmed.

## B. Determination of the Parties' Income

### 1. Husband's Income

Husband contends that his income was not $50,000 per month, as found by the court, and that the 2010 tax return, which shows that his income for 2010 was $87,000, should have been considered by the court "as best evidence of his income" in order to determine his income as a basis for child support and alimony. Wife responds that the tax return did not constitute new evidence, and, accordingly, the court correctly chose not to consider it upon Husband's motion.

A Tenn. R. Civ. P. 59.04 motion to alter or amend a judgment allows a trial court to correct errors as to the law or facts arising when a court overlooks or fails to consider certain matters. *Chadwell v. Knox Cnty.*, 980 S.W.2d 378, 383 (Tenn. Ct. App. 1998). These motions "may be granted (1) when the controlling law changes before a judgment becomes final, (2) when previously unavailable evidence becomes available, or (3) when, for sui generis reasons, a judgment should be amended to correct a clear error of law or to prevent injustice." *Vaccarella v. Vaccarella*, 49 S.W.3d 307, 312 (Tenn. Ct. App. 2001). Appellate courts review decisions dealing with Tenn. R. Civ. P. 59.04 under an abuse of discretion standard as these requests for relief are "addressed to the trial court's discretion."

*McCracken v. Brentwood United Methodist Church*, 958 S.W.2d 792, 795 (Tenn. Ct. App. 1997). A trial court abuses its discretion when it causes an injustice by applying an incorrect legal standard, reaching an illogical decision, or by resolving the case "on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). Indeed, when reviewing a discretionary decision by the trial court, the "appellate courts should begin with the presumption that the decision is correct and should review the evidence in the light most favorable to the decision." *Henderson v. ASIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010) (citing *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999).

The evidence of Husband's income included tax returns for the five years preceding trial, Husband's testimony as to his 2010 income, and David Wood's testimony relative to Husband's potential cash flow. The 2005–2009 tax returns showed that Husband earned an average monthly income of $94,202 during those years.[7] Husband testified that his total income for 2010 was $177,000 through September 30 of that year.[8] David Wood testified, based on Husband's business interests and historical cash flow calculated through personal financial statements and tax returns, that Husband's "continued income in the future . . . will average a million dollars a year." Based on the "totality of the income evidence for 2010," the trial court determined Husband's gross monthly income to be $50,000.

Husband appended his 2010 tax return, which showed $85,000 in total income, to his motion to alter or amend; he asserted that the return constituted new evidence because it had not been filed with the Internal Revenue Service until June 14, 2011 and, thus, was not available at the time of trial. Wife responded, contending that the tax return did not constitute new evidence because the information used to construct the return was available at trial, and because the return itself was incomplete and misleading; to support her response, she attached the affidavits of Mr. Myers and Mr. Wood, who attested that the return was inaccurate. Ruling from the bench at the motion hearing, the court stated with regard to the 2010 income tax return:

> Whether the [tax return] is complete or it's not complete, the Court does
> not consider that to be newly available evidence, because evidence was offered

---

[7] The tax returns showed that Husband earned $1,652,100 in 2005, $1,414,809 in 2006, $853,704 in 2007, $788,678 in 2008, and $942,853 in 2009.

[8] Mr. Wood testified that Husband's projection of $177,000 in income was "flawed" in that it failed to account for gains in equity that Husband would enjoy as he paid down debt.

at trial of what was going on in . . . his business during the year of 2010. It may not have been offered in the form of a tax return, but it was offered.

The trial court did not abuse its discretion in denying Husband's motion to alter or amend and in not considering the 2010 tax return. The previous five years' tax returns, along with the testimony of Husband and Mr. Wood, support the trial court's determination of Husband's 2010 income and Husband has not cited evidence that preponderates against the court's determination.[9] Accordingly, we affirm court's holding that Husband's monthly income was $50,000.

### 2. Wife's Income

In determining the amount of child support to be paid by Husband, the trial court considered and rejected Husband's argument that income should be imputed to Wife, finding that "Wife has no current income." Husband contends that, because the court later found that Wife had the ability to earn a salary as a school teacher, and in light of the court's award of income-earning rental properties to Wife, the court should have imputed income to Wife in determining the amount of child support he should pay.

Awards of child support are governed by the Child Support Guidelines ("the Guidelines") promulgated by the Tennessee Department of Human Services Child Support Services Division. Tenn. Code Ann. § 36–5–101(e)(2). The Guidelines have the force of law. *Jahn v. Jahn*, 932 S.W.2d 939, 943 (Tenn. Ct. App. 1996). Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(2) provides that, in determining child support, income may be imputed to a parent as follows:

> (I) If a parent has been determined by a tribunal to be willfully and/or voluntarily underemployed or unemployed; or

---

[9] In *Small v. Small*, No. M2009-00248-COA-R3-CV, 2010 WL 334637, *6 (Tenn. Ct. App. Jan. 28, 2010), this court approved the use of past tax returns to calculate average income as a basis for determining earning capacity. In that case, we determined the husband's earning capacity by averaging his income at the time of trial with his historical income average, which was calculated by using six years of tax returns and disregarding the most and least profitable years. *Id.* Applying the *Small* model in this case, we first disregard the 2005 and 2008 incomes as outliers; averaging the 2006, 2007 and 2009 incomes yields a monthly income of $89,204.61, a figure well above the $50,000 per month determined by the trial court. Assuming the correctness of Husband's testimony that his income was $177,000 through September of 2010, and that he made no further income that year, his 2010 average monthly income would have been $14,750; averaging the 2010 monthly figure into the historical average calculation of $89,204.61, would yield an earning capacity of $51,977.31 per month, again a figure above the trial court determination.

(II) When there is no reliable evidence of income; or

(III) When the parent owns substantial non-income producing assets, the court may impute income based upon a reasonable rate of return upon the assets.

The Guidelines do not presume that a parent is willfully or voluntarily unemployed. Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(2)(ii). The Guidelines enumerate factors relevant to the determination of willful or voluntary underemployment or unemployment and recognize "the role of a stay-at-home parent as an important and valuable factor in a child's life." Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(2)(iii)(III). Whether a parent is willfully or voluntarily unemployed is a question of fact that requires "careful consideration of attendant circumstances." *Richardson v. Spanos*, 189 S.W.3d 720, 726 (Tenn. Ct. App. 2002).

Wife testified that she had undergraduate and master's degrees in education and twelve years of teaching experience; she testified that the last time she taught was in the Spring of 2005, when she and Husband agreed that she would stay home to care for the children and household. Husband likewise testified that he and Wife "had an agreement, just like any other partnership, that she'd take care of the kids . . . ." This evidence supports the trial court's rejection of Husband's contention that Wife was voluntarily or wilfully unemployed and that, as a consequence, income should be imputed to her for child support purposes. It is undisputed that Wife left her employment outside the home beginning in 2005 to care for the children, who were then six and eight years of age, by agreement with Husband; the trial court properly considered this agreement in holding that Wife was not wilfully or voluntarily unemployed.

Husband also contends that the trial court erred by not imputing income to Wife for child support purposes based on the award of revenue-generating rental properties to her.

The court awarded several rental properties to Wife and found, in the context of its discussion of alimony, that "Wife's portion of the parties' marital estate includes rental property that generates taxable income of approximately $4,000 monthly." In his motion to alter or amend, Husband requested that the court impute income to Wife based upon the court's supplemental order. The court denied Husband's request that the rental income be imputed to Wife, and stated that "the parenting plan will have to be amended as things develop."

The evidence at trial included Husband's testimony that, if Wife were to receive the rental units in the division of property, she would benefit from an income of "$48,000 less expenses" per year; the expenses included property taxes, regular repairs, and further maintenance as the buildings continued to age. David Wood testified, based on 2009 figures,

that cash flow for the three rental properties awarded to Wife would be $30,441 annually, prior to taxes.[10]

Under the Guidelines, a parent's gross income includes "all income from any source," including income from self-employment. Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(1)(iv). "Income from self-employment includes income from . . . rental properties . . . less ordinary and reasonable expenses necessary to produce such income." Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(3). This court has stated, however:

> [C]ourts setting child support ordinarily look not so much to the source of the income . . . as they look to the dependability of its continued receipt.
>
> Courts should be wary of increasing child support based on possible income that is merely speculative. Instead, they should focus on "income regularly received by the obligor."

*Vivien v. Campbell*, No. W2009–01602–COA–R3–JV, 2011 WL 1837777, at *11–12 (Tenn. Ct. App. May 10, 2011) (citations omitted) (quoting *Ford v. Ford*, No. 01A01-9611-CV-00536, 1998 WL 730201, at *4 (Tenn. Ct. App. Oct. 21, 1998)).

The trial court did not err in not assigning income from rental property to Wife in its determination of child support. The record establishes that, while Wife may derive income from the rental properties awarded to her, the amount of such income is speculative, because of the uncertainty of the expenditures required to manage and maintain the property. In light of the uncertainty of the amount of income Wife would receive from the properties, as well as the effort required for her to manage the property in addition to maintaining regular employment and performing her role as primary residential parent, the trial court properly declined to include potential income from the rental properties in its determination of Wife's income. As the court noted, the child support provision in the parenting plan is subject to revision.[11]

---

[10] Mr. Wood calculated the 2009 cash flow for the 102 Hickory Trace Apartments to be $9,309, the 125 Clearview house to be $4,790, and the 2513 Old Russellville Pike (also referred to as 2513 Hickory Trace) to be $16,342.

[11] Wife argues in the alternative that her income is immaterial since Husband's income exceeds the income cap at Tenn. Comp. R. & Regs. 1240-02-04-.07(g). Because we have determined that the evidence supports the court's holding that Husband's income is $50,000 per month, we need not address this argument.

The trial court's holding, for purposes of child support calculation, that Wife had no income is affirmed.

## C. Alimony in futuro

Husband contends that the trial court erred in awarding Wife $2,500 per month in alimony in futuro because "rehabilitation is feasible and there is no economic disadvantage."[12] He also asserts that an award of alimony in futuro in this case undermines the legislative goal of self-sufficiency.

Trial courts have broad discretion to determine whether spousal support is needed. *See Garfinkel v. Garfinkel*, 945 S.W.2d 744, 748 (Tenn. Ct. App. 1996). Alimony decisions require a careful balancing of the factors in Tenn. Code Ann. § 36-5-121(i); the two most important factors are the need of the disadvantaged spouse and the obligor's ability to pay. *Varley v. Varley*, 934 S.W.2d 659, 668 (Tenn. Ct. App. 1996). Once the trial court has determined that alimony is appropriate, it must determine the nature, amount, and period of time of the award.[13] Our legislature has stated a public policy preference for temporary, rehabilitative spousal support over long-term support. Tenn. Code Ann. § 36-5-121(d)(2). The purpose of long-term spousal support is to aid the disadvantaged spouse when economic rehabilitation is not feasible in order to mitigate the harsh economic realities of divorce. *Shackleford v. Shackleford*, 611 S.W.2d 598, 601 (Tenn. Ct. App. 1980).

In making the award of alimony, the court found that Husband's business endeavors allowed the parties to enjoy "a standard of living as provided by an after-tax expenditure of $8,000 per month" and that, in addition, "the parties took vacation trips and gambling junkets, belonged to the local country club, and contributed to charitable causes." The court further found that the award of the businesses to Husband, as part of the division of marital property, would allow Husband to "continue making the same amount of funds, or more, in the future," but that Wife would be limited to earning a gross income of $48,000 per year as a school teacher, and $4,000 of taxable rental income per month. Based on these findings, the court held Wife to be relatively economically disadvantaged and able to achieve only partial rehabilitation upon gainful employment. Specifically, the court stated:

---

[12] Much of Husband's argument rests upon his contention that his 2010 tax return reflects his "true income." As we have affirmed the trial court's decision with respect to Husband's income, we will discuss only the remaining portions of his argument.

[13] The court may award rehabilitative alimony, alimony *in futuro*, transitional alimony, alimony *in solido* or a combination of these. Tenn. Code Ann. § 36-5-121(d)(1).

[Wife] will be unable to achieve, with reasonable effort, an earning capacity that will permit Wife's standard of living after divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to Husband, considering the relevant statutory factors set out in T.C.A. § 36-5-121(i) and the equities between the parties.

Appellate courts are disinclined to second-guess a trial court's decision regarding spousal support unless the decision is not supported by the evidence or is contrary to public policy. *Brown v. Brown*, 913 S.W.2d 163, 169 (Tenn. Ct. App. 1994). In *Gonsewski v. Gonsewski*, our Supreme Court stated that the role of appellate courts in reviewing an award of alimony is "to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable."[14] *Gonsewski*, 350 S.W.3d at 105 (citing *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006)).

Applying this standard of review to the record in this case, the trial court did not err in making an award of alimony *in futuro*. The court applied the correct legal standard[15] in evaluating the Wife's ability to be rehabilitated as well as the factors at Tenn. Code Ann. § 36-5-121(i). Wife submitted a statement showing expenses for the children and herself of $14,524 per month. If she obtains employment as a school teacher at the highest salary available in Montgomery County and is able to realize $4,000 monthly from the rental properties, she would achieve a gross monthly income of $8,000 per month[16]; adding the

---

[14] "Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105–06 (Tenn. 2011).

[15] The proper legal standard for awarding of alimony *in futuro* was set forth in *Gonsewski* as follows:

[A]limony in futuro is intended to provide support on a long-term basis . . . where "the court finds that there is relative economic disadvantage and that rehabilitation is not feasible." Alimony in futuro is appropriate when "the disadvantaged spouse is unable to achieve, with reasonable effort, an earning capacity that will permit the spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse."

*Id.* at 111 (citations omitted).

[16] Evidence was admitted showing that a teacher with Wife's level of education and teaching experience could receive a salary of between $39,835 in Tennessee generally and $49,000 in Montgomery

(continued...)

$3,200 per month in child support to this figure would result in $11,200. The evidence, therefore, shows that Wife is economically disadvantaged and has a need for support; the $2,500 alimony *in futuro* is reasonable.[17]

## D. Upward Deviations to the Child Support Award

Husband contends that the trial court erred in awarding an upward deviation from the presumptive amount of child support by ordering Husband to fund a trust for the children's education and by failing to make specific findings with respect to the children's private school costs.

An award of child support derived from a proper application of the Guidelines is presumed to be in the best interest of the child. *Neal v. Neal*, No. M2003-02703-COA-R3-CV, 2005 WL 1819214, at *2 (Tenn. Ct. App. Aug. 2, 2005). In order for a primary residential parent to successfully seek support in excess of the presumptive amount, the parent "must prove by a preponderance of the evidence that more than this amount is reasonably necessary to provide for the needs of the child." Tenn. Comp. R. & Regs. 1240-2-4-.07(1)(b). If the parent proves the need for support in excess of the presumptive amount, the court is to add an appropriate amount as a deviation; the court "may require that sums paid pursuant to this subparagraph be placed in an educational or other trust fund for the benefit of the child." Tenn. Comp. R. & Regs. 1240-2-4-.07(2)(g)2(iii). When making a deviation, the court must make written findings in its order detailing "the amount of support that would have been ordered under the child support guidelines and a justification for the variance from the guidelines." Tenn. Code Ann. § 36-5-101(e)(1)(A).[18]

---

[16](...continued)
County, where Wife was living at the time of trial.

[17] The award of $2,500 per month is modest, in that it will not allow her to enjoy the entire lifestyle to which the family was accustomed during the marriage which, as noted by the court, the division of property will allow Husband to continue to enjoy.

[18] The Guidelines implementing the statute require that:

(c) When ordering a deviation from the presumptive amount of child support established by the Guidelines, the tribunal's order shall contain written findings of fact stating:
1. The reasons for the change or deviation from the presumptive amount of child support that would have been paid pursuant to the Guidelines; and
2. The amount of child support that would have been required under the Guidelines if the presumptive amount had not been rebutted; and
3. How, in its determination,
(i) Application of the Guidelines would be unjust or inappropriate in the

(continued...)

### 1. Education Trust Fund

Establishing a trust for educational purposes to benefit the child is a "discretionary mechanism" available to the trial court. *Bryan v. Leach*, 85 S.W.3d 136, 153 (Tenn. Ct. App. 2001); *Nash v. Mulle*, 846 S.W.2d 803, 806 (Tenn.1993). Because deviations from the child support guidelines are discretionary, we review the trial court's decision to deviate upward for an abuse of discretion. *Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005). An abuse of discretion occurs when the trial court deviates from the statutes or guidelines without an adequate evidentiary foundation. *State ex rel. Anderson v. Taylor*, No. M2001-02193-COA-R3-CV, 2003 WL 21480087, at *4 (Tenn. Ct. App. June 27, 2003).

The parenting plan adopted by the court required that Husband deposit $15,000 per year for the oldest child and $13,000 per year for the youngest child into educational trusts; any unused portion of each trust is to be refunded to Husband after each child secures a Bachelor's degree.[19] Husband contends on appeal that "the trial court failed to account for the educational accounts worth over $300,000 [Husband] had already set up for his children in order to provide for their post-secondary education." Husband further asserts that "given that educational needs are already provided for, the preponderance is overwhelmingly against the upward deviation option the Court chose."

In the Decree Divorce, the court stated the following:

[T]he court finds by a preponderance of the evidence that the Wife has shown that the children are entitled to an upward deviation from the Guidelines; that the Husband is capable of paying an upward deviation; and that the Wife's proposal for the deviation to be satisfied by funding a post-secondary educational trust fund as proposed in her proposed permanent parenting plan is reasonable and justified.

---

[18](...continued)

> particular case before the tribunal; and
> (ii) The best interests of the child for whom support is being determined will be served by deviation from the presumptive guideline amount.

Tenn. Comp. R. & Regs. 1240–2–4–.07(1)(c).

[19] The permanent parenting plan provides that the funds in the educational trust are to be used for the children's educational use in college including: "college application fees, college tuition, room and board, books and supplies, fees, activity fees, sorority and fraternity affiliation fees, cost of traveling to and from school, reasonable monthly clothing and spending allowance, purchase of personal computer, study abroad, and laboratory fees . . ."

We agree that the evidence supports the requirement that Husband fund the trusts, as authorized by Tenn. Comp. R. & Regs. 1240-2-4-.07(2)(g)2(iii). Husband has a bachelor's degree and, as noted above, Wife has bachelor's and master's degrees; during their marriage they enjoyed a standard of living that such educations could provide. Indeed, it is undisputed that Husband has set aside nearly $150,000 for each child's post-secondary education.[20] Although the court stated at the hearing on the motion to alter or amend that it considered the existence of the accounts that Husband had previously established when it required Husband to create the educational trusts, the order does not state why these accounts were not sufficient to accomplish their intended purpose.[21]

The court acted within its discretion in ordering that the educational trusts be established; we affirm the decision that Husband establish an educational trust for each child.[22] The order, however, does not provide the factual basis upon which the amount of annual contributions was determined and neither party has cited evidence in the record of the anticipated cost of a college education for the children which could serve as a baseline for determining the reasonableness of the amount required; accordingly, the amounts of the required contributions are not supported by the evidence. As a consequence we vacate that portion of the order designating the specific amounts to be contributed in each child's account and remand the case for the court to consider further the amount of the annual contributions and to make factual findings in support of the specific amounts Husband is required to contribute. In addition, as noted, the court did not state why the existing accounts could not be used to satisfy the requirement; consequently, the court is directed to consider the extent to which the existing accounts are presently or can be restricted to provide for the children's educational needs and to make factual findings in that regard.

---

[20] Husband's testimony and exhibits appended to his Motion to Alter or Amend showed that he had purchased in the each child's name, with Husband listed as custodian: (1) 10,000 shares of stock worth $128,800; (2) a certificate of deposit (placed into what was denominated a "minor trust account") in the amount of $11,695.85; (3) a Uniform Transfer to Minor Act account in the amount of $9,226.97; the total for each child equaled $149,722.82. Wife contends that the uncertainty of the financial markets necessitate the court's order that Husband set aside additional funds.

[21] Requiring Husband to establish an educational trust where there is an existing fund for the children's post-secondary education is not unprecedented. In *Russo v. Russo*, No. M1999-02380-COA-R3-CV, 2000 WL 1785979 (Tenn. Ct. App. Dec. 7, 2000), this Court upheld the trial court's requirement that the father fund an educational trust in the amount of $1,000 per child per month despite the fact that the father had already set aside a $200,000 investment account for each child.

[22] We affirm as well that portion of the parenting plan providing that funds remaining in either account after the child secured a bachelor's degree be returned to Husband.

### 2. Private School Costs

Husband contends that the trial court's upward deviation for private school costs should be overturned due to the failure to make written findings of fact. Wife concedes that the trial court did not make the required findings of fact with respect to the children's private school costs.

The trial court may order an upward deviation from the guidelines for extraordinary educational expenses including tuition and other expenses associated with private schooling. Tenn. Comp. R. & Regs. 1240-2-4-.07(2). The Guidelines require that a monthly average of extraordinary educational expenses be based on evidence of prior or anticipated expenses and entered into the deviation section of the child support worksheets. *Edgeworth v. Edgeworth*, W2006-01813-COA-R3CV, 2007 WL 2403356 (Tenn. Ct. App. Aug. 23, 2007) (citing Tenn. Comp. R. & Regs. 1240-2-4-.07(2)(d)(1)(i)–(iii).

The trial court included in the Permanent Parenting Plan a requirement that Husband "pay the costs of the children's private high school tuition, fees, activity fees, lunch program, school trips, required books and school supplies and equipment, reasonable uniforms, regular school expenses, school lunches and tutors through their 12th grade graduation." The trial court did not make findings with respect to the amount of these expenses or enter a monthly average of the expenses into the deviation section of the child support worksheets.

No evidence was heard with respect to the amount of potential private school expenses for the children. Furthermore, as the children never attended private school before the divorce, no evidence was available of prior private school expenses. The only testimony with respect to private schooling was Wife's testimony that she would like to have the option to send the children to private school if she was unable to stay in her current home.

In the absence of evidence required by the regulations to support an upward deviation for extraordinary educational expenses and in the absence of the factual findings by the trial court, this Court cannot determine whether the trial court abused its discretion. We remand the case for the trial court to make specific findings with respect to potential private school expenses for the children, as required by Tenn. Code Ann. § 36-5-101(e)(1)(A) and the Guidelines.

### E. Costs and Fees

#### 1. Expert Witness Fees as Discretionary Costs

Husband contends that the trial court abused its discretion in awarding Wife expert witness fees for the report of Norman Hall, who testified relative to real estate appraisals. Husband further alleges that the report was not stipulated to and cannot be awarded as a discretionary cost.

Tenn. R. Civ. P. 54.04(2) permits a trial court to award costs not included in the bill of costs prepared by the clerk. Allowable discretionary costs are:

> [R]easonable and necessary court reporter expenses for depositions or trials, reasonable and necessary expert witness fees for depositions (or stipulated reports) and for trials, reasonable and necessary interpreter fees for depositions or trials, and guardian ad litem fees; travel expenses are not allowable discretionary costs.

Tenn. R. Civ. P. 54.04(2). The Advisory Commission Comment to Rule 54.04 provides further clarification that "reports stipulated by adversaries to be accurate and truthful" which avoid "the necessity of a deposition," are recoverable discretionary costs under the Rule.

When deciding whether to award discretionary costs, the courts should (1) determine whether the party requesting the costs is the prevailing party, (2) limit awards to the costs specifically identified in the rule, (3) determine whether the requested costs are necessary and reasonable, and (4) determine whether the prevailing party has engaged in conduct during the litigation that warrants depriving it of the discretionary costs to which it might otherwise be entitled. *Massachusetts Mut. Life Ins. Co. v. Jefferson*, 104 S.W.3d 13, 35 (Tenn. Ct. App. 2002); *Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d 78, 85 (Tenn. Ct. App. 2001). Awarding costs in accordance with Tenn. R. Civ. P. 54.04(2), is within the trial court's reasonable discretion. *Perdue v. Green Branch Mining Co.*, 837 S.W.2d 56, 60 (Tenn. 1992). Accordingly, we employ a deferential "abuse of discretion" standard when reviewing a trial court's decision either to grant or to deny motions to assess discretionary costs. *Massachusetts Mut. Life Ins. Co.*, 104 S.W.3d at 35; *Scholz*, 40 S.W.3d at 84. A trial court's discretionary decision will be upheld as long as it is not clearly unreasonable, and reasonable minds can disagree about its correctness. *Bogan v. Bogan*, 60 S.W.3d 721, 733 (Tenn. 2001); *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001).

Wife submitted a Rule 54.04 Motion requesting discretionary costs, including costs for Norman Hall's work on the case. Wife attached the affidavit of Mr. Hall in support

stating that, "the substance of the facts and opinions I had about the appraisals of the parties' various real estate interest were based on my independent appraisal and from reviewing appraisals conducted by real estate appraiser, Mark Young or others." Mr. Hall further stated that while employed by Wife he billed a total of $49,500 in fees and expenses, that $13,250 of those fees were accrued in reviewing appraisals provided by Husband, that $32,550 were incurred in preparation of the appraisal reports, and that $3,700 were for court attendance. In a summary attached to the Memorandum of Law in support of the Rule 54.04 Motion, Wife attributed $48,000 to Mr. Hall's work on a joint appraisal with Mr. Young and $1,500 to testimony at trial and availability to testify. In response to Wife's submission, Husband contended that there was an "absence of proof" that Mr. Hall's report was a "'stipulated report' as contemplated by Rule 54.04"; Husband attached the affidavit of Husband's trial counsel denying that the report was stipulated.

After a hearing on the matter, the court entered an Order stating:

[T]he report and presentation of Norman Hall as the real estate appraiser in conjunction with Mark Young was somewhat of a hybrid of a stipulated report and that which most of it was stipulated that there were some disagreements that Mr. Hall and Mr. Young had in their relative positions. The Court thus found that it was appropriate to award Mr. Hall sixty percent (60%) of the cost of his report or Twenty Eight Thousand Eight Hundred Dollars ($28,800.00) for the report plus his attendance fee at trial.

In sum, the trial court awarded Wife $30,300 in discretionary costs for the work of Mr. Hall.

While Wife characterizes the report as stipulated in court filings, there is no evidence to counter the affidavit of Husband's attorney denying that the report was stipulated; neither Wife nor her attorney submitted an affidavit or other evidence verifying that the report was stipulated between the parties. The court, therefore, abused its discretion in awarding Wife discretionary costs for the report.

Wife contends that if Mr. Hall's costs cannot be awarded under Rule 54.04, then they should be considered marital debt and must be equitably divided.

Marital debt is subject to equitable distribution. *Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003). "'[M]arital debts' are all debts incurred *by either or both spouses* during the course of the marriage up to the date of the final divorce hearing." *Id.* (emphasis added). We deem it appropriate, under the circumstances of this case, to include the question of whether Mr. Hall's expense should be treated as a marital debt and equitably divided in the scope of remand.

## 2. *Award of Attorney Fees*

Wife contends that the trial court erred by awarding attorney's fees without conducting a separate hearing on the issue and without a final accounting of the total amount of attorney's fees incurred.

In the Supplemental Decree of Divorce, the court awarded Wife $60,000 in attorney's fees, with a $20,000 credit for fees previously paid by Husband pursuant to the court's award of pendente lite support. In making the award the court stated that it considered Wife's position as the economically disadvantaged spouse and the complex nature of the case's necessary business valuations in determining the award of attorney's fees. The court concluded that "[t]he complexities of the case and the required pretrial litigation" justified "the fees requested by Wife's attorneys to the extent addressed in this order." The court expressly declined to conduct a separate hearing on the matter of attorney's fees and declined to award Wife the full amount of her attorney's fees she sought.

An award of attorney's fees in divorce cases is characterized as alimony *in solido* and treated as a form of spousal support. *Wilder v. Wilder*, 66 S.W.3d 892, 894 (Tenn. Ct. App. 2001). The trial court has wide discretion to award attorney fees. *Id.* Upon review, this court will not interfere with an award "except upon a showing of an abuse of discretion, where the evidence preponderates against the award, and a manifest injustice will be done if the trial court's decision is allowed to stand." *Id.*

The trial court did not abuse its discretion in its award of fees. The court was in a unique position to judge "the complexities of the case and the required pretrial litigation" and to make an appropriate award; we are not persuaded that a hearing was necessary in this regard. In addition, the evidence does not preponderate against the award and, in light of the division of marital assets and award of alimony *in solido*, Wife has not suffered a "manifest injustice" by the award.

Wife requests that, as the economically disadvantaged spouse, she be awarded attorney's fees incurred in defending this appeal. An award of appellate attorney fees is within this Court's sound discretion. *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995). In determining whether to award attorney's fees on appeal, we consider the ability of the party seeking the fee award to pay such fees, success on appeal, whether the appeal was taken in good faith, and any relevant equitable factors. *Darvarmanesh v. Gharacholou*, No. M2004-00262-COA-R3-CV, 2005 WL 1684050, at *16 (Tenn. Ct. App. July 19, 2005). Considering these factors, we are of opinion that Wife is entitled to three-fourths of the fees she has incurred for this appeal. The court on remand is directed to consider this matter and make an award accordingly.

### III. Conclusion

For the reasons set forth above, the judgment is reversed in part. vacated in part and affirmed in part. We vacate the portion of the order requiring Husband to contribute specific amounts to the education trust accounts and remand the case for the court to reconsider and to make factual findings with regard to the amount that Husband will be required to fund, if any; we vacate the requirement that Husband pay private school expenses and remand the case for the court to make appropriate findings; we reverse the court's allowance of the award of Norman Hall's fees and expenses and remand the issue for consideration as to whether Mr. Hall's bill should be treated as a marital debt; the court on remand is also to award seventy-five percent of the attorneys' fees incurred by Wife in this appeal. In all other respects, the judgment is affirmed.

_____
RICHARD H. DINKINS, JUDGE